UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RHONDA L. PITTS**,                                  Case Number 1:13 CV 719

        Plaintiff,                              Judge Solomon Oliver, Jr.

  v.                                                   REPORT AND RECOMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.                            Magistrate Judge James R. Knepp, II

### INTRODUCTION

Plaintiff Rhonda L. Pitts seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated April 2, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed in part and remanded in part.

### PROCEDURAL HISTORY

On June 24, 2009, Plaintiff filed an application for DIB and SSI benefits claiming epileptic seizures and severe depression limited her ability to work. (Tr. 168, 177, 196). Her claims were denied initially and on reconsideration. (Tr. 100, 109, 117, 124). Plaintiff requested a hearing before an administrative law judge (ALJ), which was held on July 5, 2011. (Tr. 36). Plaintiff, represented by counsel, and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 10, 36). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On April 2, 2013, Plaintiff filed the instant case. (Doc. 1).

Prior to the instant case, Plaintiff filed DIB and SSI applications on February 24, 2006, and alleged a disability onset date of June 1, 2003. (Tr. 80, 83). On December 2, 2008, an ALJ found Plaintiff was not disabled and could perform a range of light work. (Tr. 80, 87). This prior ALJ decision (Tr. 80-93) is relevant because the ALJ in the instant case followed the *Drummond* ruling, which is a Sixth Circuit *res judicata* rule requiring an ALJ to adopt the residual functioning capacity (RFC) finding in a prior decision absent a change of circumstance shown by new or material evidence. *Drummond v. Comm'r of Soc. Sec*., 126 F.3d 837, 842 (6th Cir. 1997); *see also* Acquiescence Ruling 98-4(6); (Tr. 26).

## FACTUAL BACKGROUND[1]

### Plaintiff's Vocational and Personal Background

Born December 18, 1968, Plaintiff was 39 years old at the time of her alleged disability onset date on November 27, 2008. (Tr. 13, 27). She had an eleventh grade education, attended special education classes, and had prior relevant work experience as a home health care aide. (Tr. 27, 202, 259). Plaintiff testified epilepsy, migraines, hypothryroidism, arthritis of the knee, and depression kept her from being able to work. (Tr. 43, 56).

Plaintiff lived alone in a housing assistance program and received food stamps. (Tr. 45). She did not drive but was able to use public transportation. (Tr. 45). By way of daily activities, Plaintiff visited with a neighbor twice per week, took daily naps, cared for her grandchildren once per week, watched television, crocheted and knit, read and understood the newspaper (so long as she read out loud), cared for herself, and went grocery shopping. (Tr. 30, 50-53, 444, 455, 457). She prepared food, but it took a long time; did household chores, but would get

---

1.Pursuant to this Court's order, the factual background of Plaintiff's brief shall include citation "by exact and specific transcript page number the pages relating to these facts." (Doc. 7, at 2). "**All facts relevant to the legal issues and discussion must be set forth in the 'Facts' section.**" *Id*. at 3.

overwhelmed; went shopping, but it was a big task; and her family did her banking and bill paying. (Tr. 444).

***Physical Medical Evidence***

Plaintiff alleged a history of seizures since she was twelve years old. (Tr. 244). She suffered from both grand mal seizures, which she had not experienced since she was fifteen, and staring seizures, which were more frequent. (Tr. 244). The staring seizures were triggered by high stress, and were described by observers as three-to-four minute periods when Plaintiff stared with behavioral arrest. (Tr. 244, 251). Plaintiff had not suffered from a generalized motor seizure since she was twenty years old and had trouble tracking the frequency of staring seizures because she did not know when they happened and because she lived alone, so no one was around to witness the seizures. (Tr. 251). At the hearing, she claimed to suffer from "staring seizures" three or four times per week, which she described as "blank[ing] out" for a two or three minute period. (Tr. 51-52). EEGs taken in 1998 showed left temporal transients while previous MRIs were generally normal, including in 2006 and 2007. (Tr. 244, 256, 302, 331).

Plaintiff went to the emergency room on February 17, 2006, and said she was in her usual state of health, except under a lot of stress and thought "she may have had a seizure" and then became agitated with her kids and felt vertiginous and ill. (Tr. 293, 296). A CT scan of the brain was unremarkable and she responded well to Antivert. (Tr. 296).

On July 21, 2006, Norman T. Sese, M.D., wrote that Plaintiff suffered from a seizure disorder that "[s]he would probably deal with . . . for a significant period of her life." (Tr. 487).

On June 21, 2007, Plaintiff's physical and neurological examinations were unremarkable; an EEG revealed no epileptic activity and supported a diagnosis of mild diffuse encephalopathy. (Tr. 246, 251).

3

In July 2007, Plaintiff was admitted for video EEG monitoring ("VEEG"), which revealed no epileptiform abnormalities or seizures and no evidence of active epilepsy. (Tr. 257-62). As a result, the treatment provider discontinued Neurontin and Zonegran and prescribed Trileptal monotherapy, then counseled Plaintiff on the need for careful monitoring for seizures and seizure precautions, including no driving, unsupervised swimming, or exposure to heights. (Tr. 257). At a follow-up visit, Plaintiff reported no seizure activity or medication side effects. (Tr. 262).

On September 26, 2007, Plaintiff was admitted to Lorain Community Hospital for an elective thyroidectomy. (Tr. 279). Prior to surgery, Plaintiff was advised that she would need to take a thyroid hormone for the rest of her life if she went forward with the procedure. (Tr. 422). She underwent surgery, without complication. (Tr. 281-82). However, three days later Plaintiff was sent back to the emergency room because blood work revealed low calcium levels. (Tr. 311). She was treated and released with a prescription for calcium replacement therapy. (Tr. 314-17).

On May 8, 2008, Dr. Mendoza treated Plaintiff and noted she had migraines, seizures, and poor concentration then directed her to follow up with a neurologist and psychologist. (Tr. 490). He noted Plaintiff was not significantly limited in any way, except she would sporadically be extremely limited, ostensibly during a seizure. (Tr. 491). He completed a mental functional capacity assessment, where he indicated Plaintiff was either not significantly limited or moderately limited in all areas but was unemployable due to episodes of seizure, behavior consistent with depression and anxiety, and recurrent migraines. (Tr. 493-94).

Plaintiff returned to the hospital under the care of Patricio R. Aycinena, M.D., on September 26, 2008, complaining of fatigue, weight gain, appetite increase, sleeplessness, poor

4

mood, and low energy. (Tr. 366). Dr. Aycinena noted Plaintiff needed to continue thyroid supplementation. (Tr. 368).

Nearly one year later, Plaintiff visited Dr. Mendoza complaining of seizures, depression, edema, and knee pain and requesting SSI paperwork and a new prescription for water pills. (Tr. 609). Following examination, Dr. Mendoza suggested she lose weight and get an x-ray of her knee. (Tr. 611). He also noted Plaintiff was seeing various specialists for treatment of depressive disorder, migraines, edema, and hypothyroidism. (Tr. 611).

On September 12, 2009, Plaintiff saw Dr. Mendoza for "disability paperwork" and because she wanted to adjust her anti-seizure medication. (Tr. 612). Her examination was grossly normal but Dr. Mendoza noted some psychiatric problems such as anxiousness and poor concentration. (Tr. 612-13).

Dr. Mendoza referred Plaintiff to Andrey S. Stojic, M.D., Ph.D., for a neurological evaluation. (Tr. 615-16). There, Plaintiff described her seizures as making her feel in "la la land" and said they occurred about three times per week, almost exclusively at night, without witnesses, and were triggered by poor sleep or stress. (Tr. 616). Plaintiff denied general motor seizures and complained of throbbing headaches. (Tr. 616-17). Dr. Stojic examined Plaintiff and concluded her history was suggestive of intractable focal epilepsy. (Tr. 621).

On November 23, 2009, a CT scan of Plaintiff's neck tissue was unremarkable aside from small, un-enlarged, nonspecific lymph nodes without enlarged adenopathy. (Tr. 596).

On March 15, 2011, Plaintiff saw Dianne C. Rasbitsky, C.N.P., for a thyroid problem and was instructed to continue her supplement regimen. (Tr. 559-60). On the same day, Dina Boutros, M.D., counseled Plaintiff about seizure and headache precautions. (Tr. 568).

On June 13, 2011, Dr. Mendoza produced a medical statement concluding Plaintiff would be able to stand, sit, or walk for four hours at one time for a total of eight hours in an eight-hour workday. (Tr. 641). She was unlimited in ability to bend and could frequently lift or carry up to fifty pounds. (Tr. 641). However, Dr. Mendoza indicated Plaintiff could be expected to miss five days of work per month due to migraine headaches and would need unscheduled breaks every one-to-two hours. (Tr. 641). Dr. Mendoza further indicated Plaintiff's depression would constantly interfere with a typical workday and her ability to travel would be markedly impaired. (Tr. 642).

### Mental Medical Evidence

On November 13, 2007, Plaintiff began psychological treatment at the Nord Center where she set goals to keep scheduled appointments and take medication as prescribed, cope with depression symptoms, access community resources, and keep in contact with a therapist in case of emergency. (Tr. 406). Plaintiff treated at the Nord Center through September 2008 and generally presented with a stable mood, appropriate affect, good eye contact and appetite, broken sleep habits and anxiousness about moving into a housing assistance program. (Tr. 380-83, 393, 395, 401-05). At her six month review, Plaintiff had achieved "much" progress but still needed to work on self-esteem and keep her mood under control. (Tr. 410).

Plaintiff continued therapy at the Nord Center through January 2011 to address complaints of depression. (Tr. 449-76, 523-48, 552-557, 647-49). On March 9, 2009, Plaintiff created five objectives to minimize symptoms of stress, anger, agitation, and depression. (Tr. 447). At times, Plaintiff's condition was noted to be improved or stable (Tr. 453, 457, 469, 532, 535, 557, 648) and at others, she reported trouble concentrating, with memory, depression, migraines, sleeplessness, and anxiety (Tr. 384, 387, 389-92, 394, 396, 397, 455-56, 461, 469,

471, 476, 524, 530-31). Plaintiff failed to keep several appointments (Tr. 451-52, 463, 468, 470, 472-74, 523, 526-27, 529, 555) and conducted other appointments via telephone (Tr. 376, 377-78, 382, 386, 388, 399-400, 458-59, 462, 464, 467, 528).

A mental status questionnaire was completed on September 18, 2009, by K. Srinivasa Rao, M.D., who described Plaintiff as well-groomed and alert, with normal speech and orientation to time and place, and fair abstract reasoning, insight, and judgment. (Tr. 440). Plaintiff's mood and affect fluctuated between depressed and stable, she struggled with anxiety concerning her seizure disorder, and had trouble focusing, poor concentration, poor long and short term memory, and low stress tolerance due to "continuous" seizures. (Tr. 440-41). Dr. Rao assigned a global assessment of functioning ("GAF") score of 70, indicating some mild symptoms.[2] (Tr. 440).

On September 22, 2009, Dr. Rao completed a treatment history report and noted Plaintiff had experienced seizures four times per week since age fifteen, and suffered from chronic depression, arthritic knees, and migraine headaches. (Tr. 479). Dr. Rao noted Plaintiff was seeing a neurologist, psychiatrist, and endocrinologist and was compliant with her medication, but had poor concentration, reaction to people, and was unable to walk, bend, or stand for more than 30 minutes. (Tr. 479-80).

Plaintiff's treating counselor, Diana Adams, LSW, completed a medical source statement on June 30, 2011 (and Dr. Rao signed off as the supervising doctor) where she suspected

---

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning.  American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

Plaintiff would have extreme limitation in abilities to maintain attention and concentration for two-hour periods of time, perform work activities at a reasonable pace, withstand the stresses and pressures of routine simple unskilled work, and make judgments that are commensurate with the functions of unskilled work; marked limitation in abilities to keep a regular work schedule, maintain punctual attendance, and interact appropriately with others; and moderate limitation in abilities to remember, understand, and follow simple directions. (Tr. 644-45). Ms. Adams noted Plaintiff had difficulty remembering concepts, was unfocused, and had a poor memory. (Tr. 645). She added Plaintiff's anxiety and depression was due to fear of seizures. (Tr. 645).

***Disability Related Development***

On November 2, 2009, Todd Finnerty, Psy.D., completed a psychiatric review technique and mental functioning capacity assessment. (Tr. 495, 509). He found Plaintiff had a mild degree of functional limitation in all areas, except moderate difficulty in maintaining concentration, persistence, or pace, and was either not significantly limited or moderately limited in all areas of mental functioning. (Tr. 505, 509-10). He concluded Plaintiff could perform simple, routine tasks without fast-paced production quotas and could interact with others where duties were relatively static and any changes were explained. (Tr. 512). On May 6, 2010, Frank Orosz, Ph.D., affirmed Dr. Finnerty's opinion as written. (Tr. 549).

W. Jerry McCloud, M.D., conducted a physical RFC assessment on December 11, 2009, where he found Plaintiff was unrestricted except that due to seizures, Plaintiff could never balance or be exposed to hazards and could occasionally climb ramps, stairs, ladders, ropes, or scaffolds. (Tr. 514-21). On May 18, 2010, Maria Congbalay, M.D., affirmed Dr. McCloud's opinion as written. (Tr. 550).

***ALJ Decision***

On August 26, 2011, the ALJ determined Plaintiff had the following severe impairments: epilepsy, depression, obesity, migraine headaches, and history of learning problems. (Tr. 16). The ALJ found these impairments did not meet or medically equal a listed impairment. (Tr. 18).

Plaintiff had the RFC to perform a limited range of light work such that Plaintiff was precluded from bathing or swimming in an unsupervised setting and must avoid exposure to sharp moving objects and unprotected heights. (Tr. 21). Plaintiff could not work on uneven, slippery surfaces and could occasionally climb ramps and stairs but not ladders, ropes, or scaffolds. (Tr. 21). She was limited to moderately complex routine work tasks; could perform simple, routine tasks without fast-paced production quotas; and could interact with others where duties were relatively static and any changes were explained. (Tr. 21). Based on VE testimony, the ALJ concluded Plaintiff could perform work as small products assembler, electrical parts assembler, and housekeeper, and was therefore, not disabled. (Tr. 28-30).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial

evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five–step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can she perform past relevant work?

5. Can the claimant do any other work considering her RFC, age, education, and work experience?

Under this five–step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only found disabled if she satisfies each element of the analysis, including inability to do other work, and meets the

durational requirements. 20 C.F.R. §§ 404.1520(b)-(f); 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ failed to: 1) properly weigh the opinions of Drs. Mendoza and Rao; 2) meet his burden at Step Five; and 3) properly evaluate Plaintiff's credibility. (Doc. 14). Each argument is addressed in turn.

***Treating Physician Rule***

Plaintiff argues the ALJ did not address each part of the 2011 opinions from Drs. Mendoza and Rao and did not provide good reasons to assign little weight to Dr. Rao's 2009 opinion. (Doc. 14, at 1). These arguments raise the treating physician rule.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non–treating physicians. *Rogers*, 486 F.3d at 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non–treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is [consistent] with other substantial evidence in the case record." *Id*. When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of

11

examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*.

Of importance, the ALJ must give "good reasons" for the assigned weight. *Id*. "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id*. (quoting *Rogers*, 486 F.3d at 243).

First, Plaintiff argues the ALJ failed to assign weight to all parts of Dr. Mendoza's 2011 opinion and Dr. Rao's 2011 opinion. As support, Plaintiff points to Social Security Ruling 96-5p, which holds in relevant part:

> Adjudicators must remember that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one.

SSR 96-5p, 1996 WL 374183, at *4; (Doc. 16, at 3).

Contrary to Plaintiff's argument, the text of this section is clearly discretionary. *Sinegar v. Comm'r of SSA*, 2014 U.S. Dist. LEXIS 28052, at * 21 (N.D. Ohio). Plaintiff has pointed to no rule of law which holds otherwise. Further, the reasons the ALJ gave for discounting the weight afforded to the 2011 opinions of Drs. Rao and Mendoza encompassed all of the relevant restrictions, and specific discussion of each was not required. Therefore, Plaintiff's SSR 96-5p arguments, raised in items "A" and "B" of her brief, are not well-taken.

12

Plaintiff's next argument, raised in item "C", misconstrues the ALJ's opinion. (Doc. 14, at 1, 4). Plaintiff states, "[t]he decision mentions [Dr. Rao's] 2009 opinion in connection with the listings (Tr. 20), and evaluates the 2009 opinion (Tr. 27), but does not even address [Dr. Rao's] 2011 opinion, and the evaluation of the 2009 opinion is inadequate." (Doc. 14, at 4). The confusion arises when comparing Plaintiff's brief to the ALJ's decision.

On this, Plaintiff claims the ALJ discredited Dr. Rao's 2009 opinion on page 27 of the record, because it had "no objective basis" and was unsupported "by progress notes which reveal improvement in her symptoms of depression with weight loss". (Tr. 27; Doc. 14, at 4). However, that portion of the ALJ's decision referred to Dr. Rao's 2011 opinion, and not his 2009 opinion. This is evident because the ALJ cites to Exhibit 22F (Dr. Rao's 2011 opinion), and comments on "extreme" limitations found therein. (Tr. 27, *referring to* Tr. 644). Plaintiff correctly points out that the ALJ discusses Dr. Rao's 2009 opinion as part of the discussion on the Listings (Tr. 20), but she does not argue one way or another whether the ALJ treated Dr. Rao's 2009 opinion appropriately (beyond taking issue with discussion that actually referred to Dr. Rao's 2011 opinion). In an abundance of caution, the undersigned will take Plaintiff's argument to be that the ALJ did not provide good reasons for discounting Dr. Mendoza's 2011 opinion, Dr. Rao's 2011 opinion, and Dr. Rao's 2009 opinion.

First, the ALJ provided good reasons for affording less than full weight to Dr. Mendoza's 2011 opinion. Indeed, the ALJ found it was "inconsistent with his prior assessments" and progress notes, inconsistent with Plaintiff's demonstrated improvement, and the opinion contained mental assessments outside Dr. Mendoza's specialty in internal medicine. (Tr. 25-26). Moreover, the ALJ noted Dr. Mendoza's progress notes demonstrated he only recorded Plaintiff's subjective complaints of mood swings or attention/concentration problems when she

13

sought documentation for disability purposes and Dr. Mendoza's treatment notes documented no unusual anxiety or evidence of depression. (Tr. 26). Therefore, by questioning the supportability and consistency of the opinion and specialty of the treating source, the ALJ provided good reasons to find it unpersuasive. 20 C.F.R. § 404.1527(d)(2). In other words, the ALJ complied with his regulatory obligations in affording Dr. Mendoza's 2011 treating source statement less than great weight.

Similarly, the ALJ provided good reasons for affording less than full weigh to Dr. Rao's 2011 opinion. To this end, the ALJ found:

> There was no objective basis to support their conclusions that [Plaintiff] would have "extreme" limitations maintaining attention and concentration for two-hour periods, performing work activities at a reasonable pace, withstanding the stresses and pressures of routine simple unskilled work, and making simple work-related decisions. In addition, these limitations are not supported by progress notes which reveal improvement in [Plaintiff's] symptoms of depression with weight loss[.]

(Tr. 27). By discussing supportability and consistency with the record, the ALJ complied with his regulatory obligation to provide good reasons to discredit Dr. Rao's 2011 opinion. 20 C.F.R. § 404.1527(d)(2).

Finally, turning to Dr. Rao's 2009 opinion, it is clear the ALJ considered the opinion. Indeed, as part of the Listings analysis, the ALJ suggested Dr. Rao's 2009 opinion was internally unsupported because he opined she would be capable of managing disability benefits if received despite finding Plaintiff had poor concentration and focus, was often confused, and needed to write things down to prevent forgetting. (Tr. 20). The ALJ also calls upon the findings of the 2009 opinion to note Plaintiff's seizure disorder caused increased stress and adaptation problems. (Tr. 19).

Despite this, the ALJ never assigned the opinion weight. Failure to comply with this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the

14

ALJ may be justified based upon the record." *Wilson*, 378 F.3d at 544 (quoting *Rogers*, 486 F.3d at 243). While harmless error was considered, the undersigned cannot stretch the exception to apply where the ALJ did not assign weight to the opinion, or consider it as part of his discussion on other opinion evidence of record. *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) ("[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.") (quoting *Wilson*, F.3d at 545). What is more, the Commissioner did not raise a harmless error argument. (Doc. 15). For these reasons, the harmless error exception does not excuse the ALJ's failure to assign weight to Dr. Rao's 2009 opinion.

In sum, the ALJ complied with his regulatory obligations by providing good reasons to afford the 2011 opinions of Drs. Rao and Mendoza less than full weight, but because he failed to do the same for Dr. Rao's 2009 opinion, this specific portion of the case should be remanded for analysis consistent with this opinion.

### Step Five

In arguments "D" and "E", Plaintiff challenges the ALJ's determination at step five, claiming: 1) the ALJ and VE misinterpreted state agency psychologist Dr. Finnerty's recommendation that required any changes be explained (Tr. 512); and 2) the Commissioner did not carry her burden at step five because she improperly relied on an unknown number of job-incidence figures. (Doc. 14, at 1).

To meet his burden at step five, the ALJ must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y*

15

*of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

First, Plaintiff argues the ALJ misinterpreted Dr. Finnerty's restriction that "duties are relatively static and any changes can be explained". (Tr. 512). Plaintiff claims when read "in context", Dr. Finnerty intended to say Plaintiff required "extra explanation of changes, if needed". (Tr. 512).

However, Plaintiff's argument is unavailing for several reasons. First, the hypothetical question is identical to both Dr. Finnerty's and the ALJ's RFC determinations. (Tr. 21, 62, 512). Indeed, the ALJ relied on VE testimony in response to a hypothetical which restricted Plaintiff to duties that are "relatively static and any changes can be explained". (Tr. 62).

Even if the ALJ had not included Dr. Finnerty's restriction in the RFC, the ALJ would be justified as he need only include and adopt those limitations he accepts as credible; therefore he was under no obligation to adopt Dr. Finnerty's findings verbatim. *Casey*, 987 F.2d at 1235. The

16

ALJ met his burden at step five by relying on a hypothetical question that fairly set out all of Plaintiff's limitations.

Moreover, in his mental RFC, Dr. Finnerty clearly wrote, "where duties are relatively static and any changes can be explained." (Tr. 512). In the world of social security disability, often-used phrases such as this carry particular meaning. To be sure, reviewing psychologist Dr. Finnerty meant what he said, and the ALJ and VE understood what he meant. Therefore, Plaintiff's argument, that the VE and ALJ misunderstood Dr. Finnerty's mental RFC determination, is not well-taken.

Next, Plaintiff argues "[t]he job-incidence figures relied upon by the decision are unreliable and cannot carry the agency's burden of production at step five, because they include an unknown number of part-time jobs that cannot be counted." (Doc. 14, at 5). Plaintiff's Brief lacks legal support for this point completely, but the Reply directs to the Court to SSR 96-8p, *Kane v. Astrue*, 2011 WL 3353866 (N.D. Ohio), *Welch v. Astrue*, 2011 WL 4632922 (N.D. Ohio), and the contra-authority *McNemar v. Comm'r of Soc. Sec.*, 2011 WL 5586379 (N.D. Ohio). (Doc. 16, at 5-6).

While no Sixth Circuit case addresses this issue, numerous cases within the Sixth Circuit have followed the reasoning set forth by the Seventh Circuit in *Liskowitz v. Astrue*, 559 F.3d 736 (6th Cir. 2009). *Gadke v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 138432, at *6-7 (N.D. Ohio) (collecting cases). In *Liskowitz*, the Court found the VE is not required to distinguish between part-time and full-time jobs. *Id*. at 745.

This District's tendency to follow *Liskowitz* should come as no surprise to Plaintiff's counsel, who recently raised the same issue in *Gadke*. To this end, Judge Dan A. Polster set forth:

17

It is noteworthy that Plaintiff's counsel has neglected to mention the ten district court cases in this Circuit that have found the holding and reasoning in *Liskowitz* persuasive. Rather, Plaintiff asks the Court to devise a *per se* ruling with the opposite conclusion based on two cases in which his counsel received a favorable ruling, *Kane v. Astrue*, No. 1:10 CV 1874, 2011 U.S. Dist. LEXIS 85332, 2011 WL 3353866 (N.D. Ohio Aug. 3, 2011) and *Welch v. Astrue*, No. 1:10 CV 1434, 2011 U.S. Dist. LEXIS 113308, 2011 WL 4632922 (N.D. Ohio Sep. 30, 2011). In so doing, counsel omits the one case in which he received an adverse ruling, *Janda* 2013 U.S. Dist. LEXIS 88195, 2013 WL 3200611. It is also noteworthy that the Magistrate Judge failed to address and analyze these cases since she wrote the R&R that the district court adopted in *Kane*, and now recommends a contrary ruling.

Most recently, District Judge Lioi, who authored both *Kane* and *Janda*, expressly declined counsel's request "to find that it was *per se* error for the ALJ to accept the VE's testimony despite his inability to definitively state whether his job incidence figures included part-time employment." *Janda*, 2013 U.S. Dist. LEXIS 88195, 2013 WL 3200611, at *8. Judge Lioi found that Plaintiff's argument was based on a mischaracterization of SSR 96-8p, 1996 SSR LEXIS 5. 2013 U.S. Dist. LEXIS 88195, [WL] at *7. She agreed with the court in *Derossett* that a VE is not required to distinguish between part-time and full-time jobs, especially where the plaintiff fails to cite a law or regulation standing for the opposite proposition. *Id.* . . .

*Gadke*, 2013 U.S. Dist. LEXIS 138432, at *8-10. With this, the undersigned recommends the Court find Plaintiff's argument (raised in item "E") without merit.

For the above stated reasons, the Court should find Plaintiff's arguments, that the ALJ and VE misunderstood Dr. Finnerty's opinion and the VE was required to distinguish between full-time and part-time jobs, not well-taken.

### *Credibility*

Plaintiff raises two arguments challenging the ALJ's credibility determination: 1) "[t]wo rationales used to deny disability, non-compliance and improvement, were improper[]"; and 2) the ALJ used "judicially disapproved" boiler plate language. (Doc. 14).

Regarding non-compliance, SSR 82-59 "provides that if a claimant fails to follow prescribed medical treatment and that treatment is expected to restore the claimant's ability to

engage in substantial gainful activity, a claimant must be given notice of the issue and an opportunity to show justifiable cause for noncompliance before a disability determination is made." *Kinter v. Colvin*, 2013 WL 1878883, at \*9 (N.D. Ohio 2013) *report and recommendation adopted*, 2013 WL 1869661; SSR 82-59, 1982 WL 31384. However, "courts in this Circuit have found [SSR 82-59] inapplicable in cases where the ALJ has considered the noncompliance as only one factor in assessing a claimant's credibility or in cases where no prior disability ruling was made by an ALJ that was thereafter undone by a claimant's noncompliance with treatment recommendations." *Id.*; *Hester v. Sec'y of Health and Human Servs.*, 886 F.2d 1315 (6th Cir. 1989). In other words, SSR 82-59 does not prohibit an ALJ from using evidence of noncompliance as a factor in analyzing a claimant's credibility. *Ranellucci v. Astrue*, 2012 WL 4484922, at \*11 (M.D. Tenn. 2012); *Kinter*, 2013 WL 1878883. Thus, Plaintiff's argument, that the use of noncompliance is *per se* improper, is unavailing.

Moreover, the ALJ clearly considered evidence of noncompliance as only one factor in analyzing Plaintiff's credibility. (Tr. 23); 20 C.F.R. § 404.1529(c)(3); *Felisky v. Bowen*, 35 F.3d 1027, 1039-40; SSR 96-7p, 1996 WL 374186, at \*3 (The ALJ is to consider certain factors in determining whether a claimant has disabling pain: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication to relieve pain; and 6) any measures used to relieve pain). Indeed, as part of his credibility determination, the ALJ considered Plaintiff's activities of daily living; inconsistent statements concerning the frequency of seizures, ability to travel, and ability to read; treatment history; frequency of symptoms; lack of supportability for frequency of seizure activity; and improvement of symptoms. (Tr. 23-24).

Turning to improvement, Plaintiff accuses the ALJ of misconstruing the record. Upon review, however, there are several instances in the record where Plaintiff demonstrated improvement in symptoms. (*e.g.*, Tr. 453, 457, 469, 475, 532, 535, 539, 557, 648). The ALJ did not misconstrue these instances nor did he rely solely on symptom improvement to make his determination. Rather, the ALJ considered Plaintiff's improvement to undermine her claims of disabling depression. What is more, Plaintiff does not provide any legal authority to support improper use of improvement. For these reasons, the ALJ's use of evidence of noncompliance and improvement was not in error.

Last, Plaintiff argues the ALJ used "judicially disapproved" language to make his credibility determination, pointing only to the Seventh Circuit case, *Bjornson v. Astrue*, in support. 671 F.3d 640, 645 (7th Cir. 2012); (Doc. 14, at 7). Again, Judge Polster addressed this very argument when it was raised by Plaintiff's counsel in *Gadke*:

> A quick review of *Bjornson* and the cases citing it shows that there is no Sixth Circuit case discussing *Bjornson* (thus, this Court is not bound by the opinion) or addressing the question of whether the use of this "boilerplate" language is insufficient to support the ALJ's credibility determination. Moreover, in the relatively short lapse of time following the Seventh Circuit's issuance of *Bjornson* in January 2012, at least eight district court cases in the Sixth Circuit have expressly discussed and analyzed *Bjornson* on this precise issue.
>
> For instance, the district court in *Jones v. Comm'r of Soc. Sec.*, No. 2:12 CV 110, 2012 U.S. Dist. LEXIS 155228, 2012 WL 5378850 (S.D. Ohio Oct. 30, 2012) explained:
>
> "*Bjornson*, a decision written by Judge Posner, and which took issue with the use of what he described as "a piece of opaque boilerplate" (which can also be found in the ALJ's decision in this case), rests on the premise that the language in that piece of boilerplate "implies that ability to work is determined first and is then used to determine the claimant's credibility." *Id*. at 645. This, however, "gets things backwards," *id*., because it suggests that the ALJ first determined the claimant's ability to work without taking the credibility of his or her symptoms into account, and then rejected any testimony which would be inconsistent with the ability to work simply because the decision that the claimant can work has already been made. According to the *Bjornson* court, such an approach is

inconsistent with SSR 96-7p, 1996 SSR LEXIS 4(4). However, it appears that the ultimate decision in that case, which was to reverse and remand, was based not solely upon the use of this boilerplate or "template" language, but on the ALJ's failure to marshal adequate support for his finding that the claimant was not disabled when both the medical evidence and the claimant's own testimony strongly suggested otherwise.

*Bjornson* does not appear to have been cited by any decision from the Sixth Circuit Court of Appeals. This Court has cited it once, in *Williams v. Astrue*, 2012 U.S. Dist. LEXIS 136461, 2012 WL 4364147 (S.D.Ohio September 24, 2012) (Watson, J.), concluding that although the ALJ in that case used the same language, "unlike the ALJ in *Bjornson* the ALJ in Plaintiff's case goes on to explain the credibility determination in greater detail," and affirming the ALJ's credibility finding because it was "supported by substantial evidence in the record." *Williams, supra*, 2012 U.S. Dist. LEXIS 136461, [WL] at *2-3. That approach is consistent with the way in which the Court of Appeals for the Seventh Circuit has applied *Bjornson*; for example, in *Filus v. Astrue*, 694 F.3d 863, 2012 WL 3990651, *4 (7th Cir. 2012), that court said "[i]f the ALJ has otherwise explained his conclusion adequately, the inclusion of this language can be harmless." Consequently, this Court will make the same inquiry here, examining the reasons given by the ALJ for finding plaintiff less than fully credible, and deciding if the record provides support for that finding."

Id., 2012 U.S. Dist. LEXIS 155228, 2012 WL 5378850, at *7. Most other district courts in the Sixth Circuit that have addressed *Bjornson* have agreed that it is basically meaningless for the ALJ to simply state the boilerplate language without further analysis, but have concluded that the ALJ in their cases adequately explained the credibility determination — which determination was supported by substantial evidence in the record. *See, e.g., Kelly v. Astrue*, No. 1:12 CV 1012, 2013 U.S. Dist. LEXIS 9612, 2012 WL 271803, at *12 (N.D. Ohio Jan. 3, 2013); *Jenkins v. Comm'r of Soc. Sec.*, No. 12-12161, 2013 U.S. Dist. LEXIS 77208, 2013 WL 2393648, at *8 (E.D. Mich. May 31, 2013); *Johnson v. Comm'r of Soc. Sec.*, No. 1:12 CV 114, 2013 U.S. Dist. LEXIS 56281, 2013 WL 1703894, at *4 (W.D. Mich. Apr. 19, 2013). Cf. Jackson v. Colvin, No. 4:13 CV 169, 2013 U.S. Dist. LEXIS 95464, 2013 WL 3458254, at * (N.D. Ohio Jul. 9, 2013). *But see Prather v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 27483, 2013 WL 765103, at * (E.D. Mich. Feb. 28, 2013) (agreeing that the boilerplate language alone is meaningless but remanding because the ALJ in that case failed to adequately explain the credibility determination).

*Gadke*, 2013 U.S. Dist. LEXIS 138432, at *10-14.

Here, the ALJ provided additional explanation for his credibility determination, beyond boilerplate language. (Tr. 20-23). Notably, Plaintiff does not dispute this fact. The undersigned is troubled by counsel's failure to mention any law from this Circuit which considers *Bjornson*,

despite its availability as explained to him by Judge Polster in the above-excerpted opinion. For these reasons, Plaintiff's final argument is not well-taken.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB and SSI benefits applied the correct legal standards and is supported by substantial evidence, except as stated herein. Accordingly, the undersigned recommends this matter be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

 s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).